IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS RICHARDS,

        Plaintiff,

v.                                      Civil Action No. 3:05-CV-84

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


## I.  Introduction

A.    <u>Background</u>

    Plaintiff, Thomas Richards, (Claimant), filed his Complaint on July 29, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on January 23, 2006.[2]

Claimant filed his Motion for Summary Judgment and Memorandum in Support on February 22,

2006.[3] Commissioner filed her Motion for Summary Judgment and Brief in Support on March 24,

2006.[4]

B.    <u>The Pleadings</u>

---

    [1] Docket No. 1.

    [2] Docket No. 10.

    [3] Docket No. 11.

    [4] Docket No. 12.

1. <u>Claimant's Motion for Summary Judgment and Memorandum in Support</u>.

2. <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be DENIED.

2.     Commissioner's Motion for Summary Judgment be GRANTED because the ALJ agreed with the opinion of the medical doctor whose opinion Claimant argues the ALJ failed to properly consider.


## II.  Facts

A.     <u>Procedural History</u>

On July 29, 2003, Claimant filed for Disability Insurance Benefits (DIB) alleging disability since January 18, 2003.  The application was denied initially and on reconsideration.  A hearing was held on October 19, 2004 before an ALJ.  The ALJ's decision, dated December 7, 2004, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on June 6, 2005.  This action was filed and proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 49 years old on the date of the October 19, 2004 hearing before the ALJ. Claimant has a high school education with past relevant work experience as a mechanic in the coal mining industry.

C.     <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: January 18, 2003 – December 7, 2004.

**Monongalia General Hospital, 1/30/2003, Tr. 101**
Final Diagnosis: Skin, right upper quadrant abdomen, excision: benign lichenoid keratosis.

**Monongalia General Hospital, 9/18/2002, Tr. 102**
There is vertebral body alignment, intervertebral disc height, and vertebral body height. There is preserved normal marrow signal and intervertebral disc signal. There is no finding for herniated nucleus pulposus. There is also no evidence for nerve root impingement or spinal canal stenosis.

**Julian Bailes, MD, University Health Associates, 7/28/2003, Tr. 134**
The patient has a steady gait. Motor strength is 5/5 bilaterally. There is intact sensation. The patient's back is not tender.

Assessment: Status post microlumbar diskectomy at L4-5.

**Julian Bailes, MD, University Health Associates, 5/28/2003, Tr. 138**
Assessment: now two months status post L4-5 microlumbar diskectomy, doing very well with good improvement.

**Julian Bailes, MD, University Health Associates, 4/17/2003, Tr. 140**
Assessment: The patient has some lumbar spasm.

**Julian Bailes, MD, University Health Associates, 3/17/2003, Tr. 141-42**
Assessment: status post L4-5 microlumbar diskectomy (procedure happened on 3/03/2003). Patient gradually improving.

**Julian Bailes, MD, University Health Associates, 3/03/2003, Tr. 144**
Assessment: Patient has a herniated nucleus pulposus of the right L4-5.

**Julian Bailes, MD, WVU Hospitals, 3/04/2003, Tr. 149**
Preoperative diagnosis: L4-L5 disk herniation.

Postoperative diagnosis: L4-L5 disk herniation.

**Julian Bailes, MD, WVU Hospitals, 3/04/2003, Tr. 151**
Preoperative diagnosis: L4-L5 disk herniation with lumbar radiculopathy (disease of nerve roots).

Postoperative diagnosis: L4-L5 disk herniation with lumbar radiculopathy.

**[Not specified], 3/04/2003, Tr. 155-156**
Reason for exam: diskectomy. Vertebral body height and alignment are maintained.

Reason for exam: spine localization.  Preservation of vertebral body height and alignment.

**Julian Bailes, MD, WVU Hospitals, 3/04/2003, Tr. 157**
Final Pathologic Diagnosis: Lumbar intervertebral disc: fragments of intervertebral disc, gross examination only.

**Julian Bailes, MD, University Health Associates, 3/03/2003, Tr. 159**
Assessment: Patient has a herniated nucleus pulposus of the right L4-5.

**Julian Bailes, MD, WVU Hospitals, 2/05/2003, Tr. 160**
Discharge diagnosis: Right L4-L5 herniated nucleus pulposus, status post right L4-L5 micro lumbar diskectomy.

**Julian Bailes, MD, WVU Hospitals, 11/19/2002, T. 162-63**
Impression: Evidence of degenerated disk with fissure in the anterior annulus at the L4-L5 level. Evidence for mild degenerated disk with irregularity of the nucleus at the L5-S1 level.

**Julian Bailes, MD, WVU Hospitals, 11/19/2002, Tr. 164-65**
There is contrast in the nucleus of the disk.  There is a slight irregular margin of the nucleus due to degenerative changes of the disk.  There is mild relative narrowing of the L4-L5 disk, as well as some contrast extending along the periphery of the annulus to the anterior aspect, left anterior aspect and right anterior aspect of the disk at L3-L4.  This indicates degenerative disease.  There is also some contrast extending along the periphery of the annulus to the posterior and the right posterolateral aspect of the disk.  This also indicates degenerative disease.  Contrast extends in the annulus at the left posterolateral aspect of the disc.

**Physical Residual Functional Capacity Assessment, 9/11/2003, Tr. 167-174**
EXERTIONAL LIMITATIONS:
        Occasionally lift and/or carry, 50 pounds;
        Frequently lift and/or carry, 25 pounds;
        Stand and/or walk (w/ normal breaks) total of about 6 hours in an 8-hour workday;
        Sit (w/ normal breaks) total of about 6 hours in an 8-hour workday;
        Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
        None established.

MANIPULATIVE LIMITATIONS:
        None established.

VISUAL LIMITATIONS:
        None established.

COMMUNICATIVE LIMITATIONS:

None established.

ENVIRONMENTAL LIMITATIONS:
 Extreme cold: avoid concentrated exposure;
 Extreme heat: avoid concentrated exposure;
 Wetness, Humidity, Noise, Vibrations, Fumes, Poor Ventilation, etc., Hazards (e.g. heights, machinery): unlimited.

**Physical Residual Functional Capacity Assessment, 12/17/2003, Tr. 187-194**
EXERTIONAL LIMITATIONS:
 Occasionally lift and/or carry, 50 pounds;
 Frequently lift and/or carry, 25 pounds;
 Stand and/or walk (w/ normal breaks) total of about 6 hours in an 8-hour workday;
 Sit (w/ normal breaks) total of about 6 hours in and 8 hour workday;
 Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
 None established.

MANIPULATIVE LIMITATIONS:
 None established.

VISUAL LIMITATIONS:
 None established.

COMMUNICATIVE LIMITATIONS:
 None established.

ENVIRONMENTAL LIMITATIONS:
 Extreme cold: avoid concentrated exposure;
 Extreme heat, Wetness, Humidity, Noise, Vibrations, Fumes, Poor Ventilation, etc., Hazards (e.g. heights, machinery): unlimited.

**Monongalia Physical Therapy Services, 8/15/02, Tr. 217**
Assessment: Right hip strain/sprain

**Andrew Mace, MD, 11/21/2003, Tr. 227-228**
Findings: Central contrast noted in nucleus of disk at L3-L4 with slight irregularity of margins of this contrast collection. This is likely indicative of early degenerated disk changes. There is slight hypertrophic degenerative joint disease at facet joints at L3-L4. Exam shows contrast in nucleus at L4-L5 disk, and irregularity of margins of nucleus due to degenerated disk. Mild to moderate degenerative joint disease involves facet joints at L4-L5 with hypertrophic changes. At L5-S1 level, there is contrast noted centrally in the nucleus. There is irregular appearance of nucleus indicative of degenerated disk at L5-S1 disk. Mild hypertrophic degenerative joint disease involves facet joints

at L5-S1 level.

**Andrew Mace, MD, 11/21/2003, Tr. 229-230**
A discogram revealed contrast in the nucleus of the disk. There are mild irregularities of the contour of the margin of the nucleus at the L3-L4 disc. This conforms with an early finding of degenerated disc at L3-L4. There is mild relative narrowing of the L4-L5 disc and contrast in the nucleus and annulus of the L4-L5 disc. There is irregular contrast and fissuring, extending to the posterior surface of posterior margin at the L4-L5 disc, at the right posterolateral margin of the L4-L5 disc, at the right lateral margin of the L4-L5 disc, and at the anterior margin of the L4-L5 disc. This indicates degenerated disc at L4-L5 with fissuring in the annulus.

**Anesthesia Record, WVU Hospitals, 5/17/2004, Tr. 254**
Preoperative Diagnosis: chronic pain lower back, right leg and hip.

Postoperative Diagnosis: chronic pain lower back, right leg and hip

**Richard Vaglienti, MD, Department of Anesthesiology, WVU Hospitals, 5/17/2004, Tr. 267**
Preoperative Diagnosis: Hip and thigh sprain.

Postoperative Diagnosis: Hip and thigh sprain.

**Richard Vaglienti, MD, Ruby Day Surgery Center, 2/09/2004, Tr. 283**
Preoperative (lumbar epidural) diagnosis: chronic pain.

Postoperative diagnosis: chronic pain.

**Richard Vaglienti, MD, WVU Hospital, 2/09/2004, Tr. 289**
Admit Diagnosis Text: sprain of hip and thigh.

**Andrew Mace, MD, 11/18/2002, Tr. 307**
A diskogram at level L4-L5 revealed contrast in the nucleus. There is an irregular margin of the nucleus due to degenerative changes of the disk. There is mild relative narrowing of the L4-L5 disk. Degenerative disk disease is indicated by contrast along the periphery of the annulus to the anterior aspect, left anterior aspect, and right anterior aspect of the disk at L3-L4. There is contrast extending along the periphery of the annulus to the posterior and the right posterolateral aspect of the disk, which is indicative of degenerative disease. There is mild protrusion or bulging by diskography at the right posterior and posterolateral aspect of the L4-L5 disk with intact posterior longitudinal ligament.

At the L5-S1 level, diskogram shows contrast in the nucleus of the disk with slight irregular margins of the nucleus indicative of degenerative change. There is contrast extending in the annulus of the at the left posterolateral aspect of the disk in a thin line with contrast at the periphery of the left posterolateral aspect of the disk.

**Andrew Mace, MD, 11/18/2002, Tr. 309**

There is contrast in the nucleus of the L4-L5 disk, and there is mild irregularity of the margins of the nucleus indicative of some degenerative disk change. There is contrast noted with a fissure in the annulus at the anterior central aspect of the L4-L5 disk, extending to the anterior peripheral margin of the disk. Contrast is also noted along the peripheral margin of the annulus at the left anterolateral, at the right anterolateral, at the anterior, at the posterior, and at the right posterolateral aspects of the L4-L5 disk. There is a mild diffuse bulging of the disk at the posterior, right posterolateral and left posterolateral aspects of the disk. There is also mild to moderate degenerative joint disease.

At the L5-S1 level, there is contrast noted centrally in the nucleus. There is irregular appearance of the nucleus indicative of some degenerative changes at the L5-S1 disk. There is slight contrast noted with a fissure in the annulus, suggesting slight focal rupture of the annulus and degenerative change at the left posterolateral aspect of the L5-S1 disk within the intervertebral foramen.

**Lloyd Kurth, DO, Mountainstate Orthopedic Associates, 9/23/2004, Tr. 313**

Current Diagnosis is lumbar disc disease.

**Richard Vaglienti, MD, West Virginia Pain Treatment Center, 2/9/2004, Tr. 327**

Diagnosis: sprain of hip.

**Richard Vaglienti, MD, West Virginia Pain Treatment Center, 1/19/2004, Tr. 330**

Diagnostic Impression:
- A.      Intervertebral disk disease.
- B.      Multilevel herniated nucleus pulposus.
- C.      Radicular right lower extremity pain, most likely as a result of post laminectomy syndrome.

**Richard Vaglienti, MD, 1/19/2004, Tr. 333**

Diagnostic Impression:
1. Hip and thigh sp/st (?)
2. IDD (Dorland's gives "insulin dependent diabetes" for abbreviation)
3. Radicular pain right lower extremity
4. Postlaminectomy syndrome

**Richard Vaglienti, WVU Hospitals, 8/02/2004, Tr. 347**

Preoperative (spinal cord stimulator) diagnosis: failed back surgery syndrome.

Postoperative diagnosis: Failed back surgery syndrome.

**Anesthesia Record, WVU Hospital, 8/02/2004, Tr. 357**

Preoperative diagnosis: chronic pain, back and right leg.

Postoperative diagnosis: chronic pain, back and right leg.

**Gary Marano, 8/02/2004, Tr. 369**
Findings: Metallic components of spinal cord stimulator device enter spinal canal at L3 level.
 Alignment of the thoracolumbar spine is anatomic. There is preservation of vertebral as well
 as disk space height. Soft tissues are unremarkable.

**Jack Koay, MD, 11/06/2004, Tr. 383**
Clinical Impression:
A.      Status post Microlumbar diskectomy at L4-5 levels.
B.      Status post insertion of permanent spinal cord stimulator lead placement.

Prognosis: neurologically it is stable at this moment on the lumbar spine.

D.      <u>Testimonial Evidence</u>

 [EXAMINATION OF CLAIMANT BY ALJ]

 Q       And how much do you weigh?

 A       About 200.

 Q       Is that more or less than you weighed a year ago or the same?

 A       I'm going to say right around the same. I've tried to maintain with this problem

because I don't want to get any worse than I am.

 Q       All right, so that's been your weight for some years roughly give or take - -

 A       Exactly. My weight has been, I mean I've been the same for - - I've been in 36

pants since a senior in high school so I've stayed about the same.

 Q       That's pretty good.

 A       So - -

 Q       Okay. Using any device to get around, a cane or crutch?

 A       No, I didn't want to do that because I just didn't think I needed to do that.

 Q       Okay. Did you finish high school?

 A       Yes.

8

Q       Anything after high school?

A       No, went to work right out of high school.

Q       In the mines?

A       Yes.

                        *              *              *

Q       Okay, you don't have any problem reading?

A       No.

Q       Do you drive?

A       Yes.

Q       Okay, you driver's license is current?

A       Yes.

Q       Did you drive here today?

A       Yes.

Q       Do you have any problem driving long distances?

A       Yes.

Q       How far before you have a problem?

A       It all depends on the day. My good day I mean there maybe - - driving, if I have to drive an hour and a half is the maximum I will be able to drive before I need to get out and walk around for a little bit or just relax for a little bit. Walk around or just throw my legs out the side of the seat instead of just sitting in the position I've been in.

Q       All right, what about a bad day?

A       Bad day, 30 minutes.

Q       Well, in a month how many bad days do you have and how many good days do you have?

A       Here lately I've been having more bad days so I'm going to say 20.  And I don't know whether it's the weather change or what it is but things - -

Q       And that's up a little bit in your view?  It's gotten a little worse sometimes?

A       It has gotten worse, yes, since I had the stem implant put in.

Q       What kind of car do you drive?

A       Ford F250, pickup truck.

Q       Do you have any problems getting in it?

A       No, it's got handles on it and running board so I don't - -

                    *                    *                    *

Q       What did you do yesterday?  What time do you wake up?

A       I generally, on a good nights' sleep I would generally get up between 8:00 and 8:30.

Q       Is that what you did yesterday?

A       Yes.

Q       Okay.

A       And I got up and I fed my dogs and my cats.  And I read the paper.  And yesterday my nephew had called me that he had shot a deer with a bow and was a little panic stricken because he didn't find a deer so he called me.  So I was going to go for a walk anyhow so I said, well, I'll go out and see what's he got.  So I just went out, and it was a nice level place to walk and I walked around for him and helped him find the deer.  And that's what my day was

yesterday.

Q Did you find it?

A Yes, he found it.  It was a nice day to be out in the wood.  It was just a beautiful day and it was good day yesterday for me.

Q So you can walk on level ground?

A I walk fairly well and I'm - - yes.

Q How long has that been since the accident, I mean since your accident have you been able to walk on level ground?

A Since the stimulator has been put in I've been able to walk - -

Q And that - -

A - - I've been able to walk much better.  I don't have a limp now because I don't have the hip pain.  And before the stimulator I had trouble walking up steps and up - -

Q That was in May?

A - - at an angle.

Q Was that in May?

A Pardon me?

Q The stimulator was in May of this - -

A August 2nd is when - -

Q That was - -

A - - it was installed.  I had a trial put in.  There's a trial and I don't remember the date when the trial was put in.  Because they put a trial stimulator in to see if it'll work first.

*   *   *

Q     Yeah.  So, and then August 2nd you had a permanent stimulator - -

A     Yes.

Q     - - and it's helped somewhat?

                    *          *          *

Q     Okay.  Yeah, I noticed that you'd reported that things start off better in the morning and go down hill - -

A     Yes.

Q     - - and it's been the case for some time.  How is that since August 2nd?

A     It's the - - it was - - I was going to say for the first month I thought, you know, this is really going to be a fantastic thing.  But now it's gone back pretty much to the way it was.  I mean some days I will have a good day until 4:00 or 5:00.  Other days it'll be 11:00, 11:00 to 1:00 when I'll go, just go lay down for a couple of hours.  Take a Loratab or two and just lay down just two to three, four hours whatever it's going to take to do it.  And then I'll get up in the evenings and fix dinner or whatever, feed the animals again.  Upstairs watching TV.  Try to do a little housecleaning if I can get that done.  Go to the store, whatever.

Q     So you're pretty good after you wake up - -

A     Yes, I'm - -

Q     - - for some - -

A     - - yes, I have excellent mornings.

Q     - - period of time.  Are you fairly unrestricted in the mornings?

A     Um-hum.

Q     Driving, walking, sitting - -

A        Other than the Neurontin causes blurred vision.  I mean some mornings are worse than others and I didn't know whether it's because of what I've eaten the day before, the night before, or whatever.  I don't know that either but that's part of the Neurontin.  If you look it up in the PDR everything that - -

Q        Yeah.

A        - - goes along with it is right there.

Q        How often do you have blurred vision?

A        About every day but it's just some days it's worse and that's why I don't whether it's due to the diet, something I'd ate, you know - -

Q        Right.

A        - - work with the medicine or what.

Q        Do you watch TV?

A        Yes.

Q        How much a day?

A        It all depends on what I'm doing.  I mean if I want to go out and do something in the yard.  I'm going to say four or five hours.

Q        Do you do your yard work now?

A        Yes, I always have.  I never quit because I feel I need to be active to try to help this problem out.  Help myself mentally too.

Q        How big is the yard?

A        It's an acre, a little over an acre.

Q        Do you cut it with a walking or riding mower?

A     I have a tractor and then I also have a self-propelled walk behind.

Q     Which do you use?

A     Both.  I mow the majority of it with the tractor and then I do some trimming.  It may - - I mean before this happened it took me three hours to mow my grass and now it takes me three to four days so - -

Q     Are you able to participate in any of your hobbies?

A     I haven't, no.  I used to like to hunt and fish and I haven't done anything yet.  The main thing is since I've had the stimulator in I'm not supposed to do very much.  So that's - - I haven't done very much.

Q     What about swimming?

A     No, I haven't done any swimming because there's no, really no place around here to go swimming.   And physical activity is supposed to be, you know, slowed   until the three month period after the permanent stimulator is put in for me.  No strenuous exercise or - -

Q     So when's the last time you went swimming?

A     I think in July.  I think I was out at the lake with my sister and her boyfriend on our boat.

                    *               *               *

Q     What about fishing, when's the last time you went fishing?

A     It's before my injury.

Q     How about hunting?

A     I did get to go deer hunting last year.

Q     Last winter?

A      Yes, last November, Thanksgiving week.

*         *         *

Q      Do you do any exercises - -

A      Not right now. I was, I was in physical therapy everyday for I don't know how long and then three days a week for I don't know how long.  And so we decided that, that was not going to - -

Q      Um-hum.

A      - - benefit me any.

*         *         *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      When you were hunting last year how much actual hunting did you do?

A      I went out and drove out to where they were hunting and sat there for, you know, I don't know, I'm going to say four or five hours a day.

Q      Sat where?

A      Sat in the truck.

Q      Did you get a deer?

A      Yes, I did.

Q      Did you shoot it from the truck?

A      No, I was outside the truck at that time.

Q      Standing outside the truck?

A      Yes, I was outside, standing outside the truck.

Q      So the deer were hunting you and you just waited on them to come by?

A        Well, that's when - - yeah, that was so neat about last year.  That's all I had to do last year was just pull the trigger and everybody came running because they knew where I headed and -                                         *                *                *

(The vocational expert, TIMOTHY MAHLER, having been duly sworn, testified as follows:)

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

*                *                *

Q        Okay.  Can you, relying on your education and experience and knowledge of Social Security rules, can you identify the claimant's work activity?

A        Yes, work activity I saw in the file, Your Honor, was a mechanic in the coal mines.  And this is classified by the DOT as medium, skilled work.  The DOT code is 630281022.

Q        Would there - - would the claimant have acquired any skills that could transfer to light or sedentary work?

A        There would be a few light jobs, Your Honor, but no sedentary.

Q        If an individual was limited, of claimant's age - - excuse me.  If the claimant was limited to light work he would not be able to perform his past work I take it?

A        No, Your Honor, he could not.

Q        Okay.  Assume an individual of claimant's age, education, and experience and assume first that the individual can perform a full range of light work with a sit/stand option.  No extremes in temperature or humidity. And limited to walking on even surfaces.  Would there be work in the national economy or one of the regional economies that such an individual could perform?

A      Yes, Your Honor, there is light, unskilled work with a sit/stand option that would not expose the worker to temperature extremes or uneven ground.  Some examples I could offer would be, let's see, mailroom clerk, 365 local, 152,000 nation.  There are desk attendants in places such as game arcades, tanning salons, 200 local, 55,000 nation.  There are also inspector/checker in small products, 800 local, 111,000 nation.  And there are assemblers of small products, 1500 local, 464,000 nation.  The local area I'm referring to is the northern West Virginia and southwestern Pennsylvania, Your Honor.

Q      Considering my hypothetical would such a person be capable of performing any jobs for which the claimant has transferable skills?

A      No, Your Honor.  The jobs he would have transferable skills for would not have a sit/stand option, Your Honor.

Q      Okay.  If we added to the, added to that hypothetical the requirement that there only be occasional postural activities would that change the occupation?

A      No, Your Honor.

Q      Okay.  Let me give you an additional hypothetical and that would be an individual of the claimant's age, education, and experience, work experience, who could do a full range of sedentary work with a sit/stand option.  And with no extremes in temperature or humidity.  And I don't know if it's relevant, but limited to walk, the walking that's done on even ground.  Would there be any jobs in the national economy or one of regional economies that such an individual could perform?

A      Yes, there would be, Your Honor.  With those limitations at the sedentary level there are sedentary cashiers, 3000 local, 555,000 nation.  There are surveillance system monitors,

17

50 local, 15,000 nation. There are sedentary assemblers of small products, 650 local, 149,000 nation. And there are waxers of glass products, 160 local, 66,000 nation. These are all sedentary, unskilled jobs, Your Honor.

Q    Okay. Would the further limitation of occasional postural activities change your answer?

A    No, Your Honor, it would not.

Q    Okay. Now to the sedentary if we added the requirement that because of the individual's physical condition and pain he needed to lay down for one hour in the a.m. during the workday and one hour in the p.m., would that corrode the occupational base?

A    Yes, your Honor, if this is the case this individual cannot sustain any of these jobs at the sedentary or light level. These jobs all assume an ability to sustain work activity for two hours before break and the breaks are only 15 minutes each. One's in the morning and one's in the afternoon and a half hour for lunch. You cannot lie down for two hours during a workday at all -

Q    Okay.

A    - - in competitive work.

Q    Would that also be true for the light jobs that you described?

A    Correct, Your Honor.

Q    Okay. Have your answers been consistent with the Dictionary of Occupational Titles?

A    Yes, Your Honor. The only inconsistency is the sit/stand option is not mentioned in any of the definitions in the DOT. The reason I offer these jobs is based on my experience in

placing disabled workers for the past 25 years. And dealing with various employers I found that these jobs typically permit the worker to sit and stand while doing essential duties.

E.     Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Can climb stairs (Tr. 401-402)

• Weight: 200 pounds (Tr. 402)

• Reads the paper (Tr. 406)

• Cares for pets (Tr. 406)

• Can walk "fairly well" on level ground (Tr. 406)

• Watches television 4-5 per day (Tr. 408)

• Prepares meals (dinner) (Tr. 408)

• Does housecleaning (Tr. 408)

• Goes to the store (Tr. 408)

• Does yard work (uses self-propelled lawnmower and tractor) (Tr. 409-410)

• Can drive (Tr. 403-404)

• Attends hunting trips (Tr. 411, 413-414)

## III.  The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant makes only one assignment of error against the ALJ's decision. He argues simply

that the ALJ failed to assign the proper weight to a medical opinion by one of Claimant's physicians, Dr. Lloyd Kurth. Claimant asks this Court to remand the case to the Commissioner so that the ALJ may properly consider the opinion of Dr. Kurth. Claimant styles his motion as asking for "summary judgment," although he does not seek a final judgment regarding his entitlement to benefits, but only remand. See Fed. R. Civ. P. 56(c) (speaking of judgments, not motions for remand). Nevertheless, this Court will here consider whether Claimant is entitled to remand as a matter of law.

The Commissioner argues that the ALJ properly considered all the medical evidence before him. She contends that Claimant places undue reliance on the opinion of Dr. Kurth, who himself stated he did not act as Claimant's primary physician. Commissioner also argues that even if Dr. Kurth's opinion should be taken to state that Claimant has a disability, that opinion is inconsistent with the other available evidence. Thus, the Commissioner argues that substantial evidence supports the ALJ's decision, which she asks this Court to affirm.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his

rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn

Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are

unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all

of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial

evidence consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled,

the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine:

1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her

impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past

work; and 5) whether the claimant is capable of performing any work in the national economy. Once

claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from

a listed impairment. If the claimant does not have listed impairments but cannot perform her past

work, the burden shifts to the Secretary to show that the claimant can perform some other job.

Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).


C.    Discussion

                  The Commissioner Properly Weighed All Medical Evidence

        Claimant's sole argument against the ALJ's decision is that the ALJ failed to accord proper

weight to the opinion of one of Claimant's physicians, Dr. Lloyd Kurth. Commissioner argues that the ALJ properly weighed all the evidence before hi, including the opinion of Dr. Kurth, in denying Claimant benefits.

It is the duty of the ALJ, not the courts, to make findings of fact, and the court will not substitute its judgment for that of the ALJ as long as substantial evidence exists. Hays, 907 F.2d at 1456. While the ALJ must consider a physician's report on the nature and severity of an applicant's impairments, the ultimate legal determination of a claimant's residual functional capacity rests with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). Nevertheless, the opinion of a treating physician will be given controlling weight if the opinion is 1) well supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Claimant contends the ALJ should have assigned more weight to Dr. Kurth's opinion. That opinion, upon which Claimant rests his entire case, was set out by Dr. Kurth in a brief, one page letter to Claimant's attorney. (Tr. 313). Due to the immense importance of the precise details of this letter in deciding this case, the relevant contents are set forth below:

> 2. His [Claimant's] current diagnosis is lumbar disc disease. He still has pain in his low back and radicular pain in his leg. He has multiple disc problems in his cervical

23

spine.

3. In answer to number 3, the nature and severity of Mr. Richard's symptoms are credible and consistent given with the objective medical findings. His findings were always that of radicular pain into his right leg and subsequently he even had surgery to relieve that.

4. I am not a legal doctor. I don't know what the Social Security regulations are. I feel that is up to you all to decide from the medical records. But I can say, with a degree of medical certainty, that Mr. Richard's symptoms are credible, and he still has continued pain from his lumbar disc problem.

Id. Dr. Kurth's letter stated that Claimant suffered from four distinguishable ailments: 1) lumbar disc disease, 2) low back pain, 3) multiple disc problems, and 4) radicular pain in his right leg. Id. Dr. Kurth found that these "symptoms are credible and consistent given with the objective medical findings." Id. He found this the case "with a degree of medical certainty." Id. Claimant contends the ALJ ignored these findings.

In fact, the ALJ acknowledged all of these findings. First, the ALJ found Claimant had "lumbar disc disease, status post lumbar diskectomy, L4-5, and lower back pain syndrome." (Tr. 16). This clearly acknowledged problems 1) and 2). The ALJ later explained the diskectomy surgery occurred to repair a disc herniation. (Tr. 17). This recognized problem 3). Finally, the ALJ noted that Claimant received a diagnosis of right lower extremity pain in January 2004. (Tr. 18). This lastly acknowledged ailment 4). Thus, the ALJ acknowledged Dr. Kurth's assessment as correct. He fully agreed with Dr. Kurth's findings.

Although the ALJ acknowledged Claimant suffered from all the conditions mentioned by Dr. Kurth, he nevertheless found he did not qualify for Social Security benefits. He did this by painstakingly reviewing Claimant's history, complaints, and credibility. (Tr. 16-20). It is not

necessary to completely review the ALJ's analysis here since Claimant has challenged only the supposed failure to accord the proper weight to Dr. Kurth's letter. It suffices to note that the ALJ found Claimant's disabilities did not impose severe enough limitations to make him eligible for Social Security benefits. (Tr. 16-20). The ALJ never denied Claimant suffered from the afflictions mentioned by Dr. Kurth. (Tr. 16-20). He simply said they did not constitute the great limitations necessary for the reception of benefits. (Tr. 16-20). Dr. Kurth's letter did not state anything about the degree of Claimant's illnesses.[5] (Tr. 313). It simply said he had them. Id. Indeed, Dr. Kurth expressly referred the question of Claimant's disability to the judgment of the ALJ. Id.

Claimant also notes the ALJ's decision does not contain any express reference to Dr. Kurth's opinion. A failure to expressly consider the findings of a treating physician may form the basis for remand. Leslie v. Barnhart, 304 F. Supp. 2d 623, 631 (M.D. Pa. 2003). The Court will remand where the ALJ gave less weight to the findings of a treating physician than other physicians and did not indicate his reasons for making that determination. Cook v. Barnhart, 347 F. Supp. 2d 1125, 1134 (M.D. Ala. 2004) (stating that "the ALJ must clearly articulate the reasons for giving less weigh to the opinion of a treating physician, and the failure to do so is reversible error"). Yet in this case, the ALJ did not assign less weight to the opinion of Dr. Kurth. While he did not expressly discuss it in his decision, he fully agreed with its contents, as stated above. An express mention of Dr. Kurth's letter would only serve to re-state and expound upon the ALJ's own position. Cf. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (finding the ALJ did not err in failing to expressly consider the opinion of a physical therapist where the therapist did not expressly find the claimant disabled and did not

_____

[5]Even if Dr. Kurth had expressly found Claimant's illnesses to constitute a disability, his determination would not by itself control. The judgment of legal disability rests with the ALJ. 20 C.F.R. § 404.1527(d)(2); (e)(2).

provide significant treatment).

Claimant cites little law to support his argument. In fact, he cites no case law at all. He cites only two sources of law: 20 C.F.R. § 404.1527 and Social Security Ruling (SSR) 96-2. Claimant first notes that 20 C.F.R. § 404.1527(d)(2) requires the ALJ to give controlling weight to opinions by treating physicians under certain circumstances. He correctly states that (d)(2) requires a treatment relationship. He also correctly notes that for a physician's opinion to have controlling weight, it must have support in medically accepted techniques and must not contradict other substantial evidence. Id. The opinion must be a medical opinion. 20 C.F.R. § 404.1527(a)(2). Claimant argues that Dr. Kurth's opinion satisfies all these criteria. Therefore, he contends the ALJ should have given the opinion controlling weight in his decision. In the alternative, Claimant argues that even if Dr. Kurth's opinion should not receive controlling weight, SSR 96-2 requires the ALJ to at least consider the opinion.

For the reasons already stated, Claimant fails to realize that the ALJ fully agreed with Dr. Kurth. Just as Dr. Kurth found that Claimant suffered from "lumbar disc disease" and "pain in his low back and radicular pain in his leg . . . [as well as] multiple disc problems in his cervical spine," the ALJ determined that Claimant "has lumbar disc disease, status post lumbar diskectomy, L4-5, and lower back pain syndrome." (Tr. 16, 313). The ALJ also found Claimant had a herniated disc and had a diagnosis of radicular pain in his right leg. (Tr. 17-18). The ALJ agreed with Dr. Kurth's assessment. Claimant only asks for the ALJ to more closely consider Dr. Kurth's opinion. Yet he already has what that could yield in his favor–namely, the adoption of Dr. Kurth's assessment.

The ALJ properly considered the medical opinion of Dr. Kurth. Indeed, he fully agreed with it and stated as such in his opinion by finding Claimant suffered from the same  illnesses Dr. Kurth

described.  Claimant already has the ALJ's adoption of Dr. Kurth's opinion, which is all he seeks.

## IV. Recommendation

For the foregoing reasons:

1.      I recommend that Claimant's Motion for Summary Judgment be DENIED.

2.      I recommend that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ agreed with the opinion of the medical doctor whose opinion Claimant argues the ALJ failed to properly consider.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: August 23, 2006

/s/ James E.  Seibert_____
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE